### WISCONSIN-MINNESOTA LIGHT & POWER CO. v. RAILROAD COMMISSION OF WISCONSIN et al.

(District Court, W. D. Wisconsin.   July 21, 1920.)

**1. Public service commissions ☞7—Jurisdiction to restrain enforcement of statutory rate must await action of state commission.**

Where a light and power company, serving 32 communities in the state at rates fixed by statute, but which are subject to change by a state commission, has applied to the commission for an increase in rates, it cannot, pending such application, invoke the jurisdiction of a court of equity to enjoin enforcement of the existing rates as confiscatory; nor does the fact that the commission has acted in respect to certain of the rates, unsatisfactorily to the company, give the court jurisdiction to review all the rates, which are more or less interdependent, and must be considered together to determine their reasonableness, in advance of final action by the commission.

**2. Public service commissions ☞7—Temporary loss pending adjustment of statutory rates not ground for injunction.**

A light and power company *held* not entitled to a preliminary injunction from a federal court to restrain enforcement of rates fixed by the state, alleged to be confiscatory, to protect it against loss pending an application to a state commission for an increase of such rates.

**3. Injunction ☞137(4)—Preliminary injunction not granted, where facts are in dispute.**

A case for granting of a preliminary injunction, restraining enforcement of rates fixed by a state commission as confiscatory, *held* not made, where the allegations of the bill were met by affirmative counter allegations of fact in the answer, tending to show that the rates are reasonable.

In Equity.   Suit by the Wisconsin-Minnesota Light & Power Company against the Railroad Commission of Wisconsin and John J. Blaine, Attorney General.   On motion for preliminary injunction.   Denied.

The plaintiff, a corporation organized under the laws of Wisconsin, is in the conduct of a public utility, and the defendants are the Railroad Commission, created under the laws of Wisconsin, with authority to regulate rates to be charged by public utilities, and the defendant Blaine, the Attorney General of the state.   The plaintiff, as such utility, furnishes electric, gas or hot-water heating service in 32 communities in this district, gas service in La Crosse, Eau Claire, and Chippewa Falls, and hot-water heating service at La Crosse.   The plaintiff's outstanding common stock and preferred stock are $2,500,000 and $5,000,000, respectively, its outstanding bonds, secured by mortgage lien upon its property, $10,720,000, the entire proceeds of which, so

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the original bill avers, are invested in plaintiff's properties in Wisconsin and Minnesota, and "the fair value of plaintiff's properties is not less than the aggregate amount of such outstanding securities."

The bill makes reference to various provisions of the Wisconsin Statutes, conferring upon the defendant commission power to regulate public utility rates, imposing upon utilities the duty of filing with the commission schedules exhibiting effective rates, tolls, and charges, which rates are required to be, not in excess of those in force on April 1, 1907, the prohibition against charging or receiving greater or less or other compensation for service than the schedule rates, except and unless authorization therefor be obtained from the commission, the penalties denounced by such statutes against the violation of the provision just noted, the procedure and the right to follow it in respect of dissatisfaction by utility with its rates, to which reference complainant adds the following allegation: "But there are no provisions in the statutes of Wisconsin requiring the commission to determine the matters involved in such complaint within any fixed period, or providing any manner of reimbursement to the utility for the losses it may sustain while its complaint is pending and undecided." Reference is made to the statute (Wis. St. 1919, § 1797m102) imposing upon the commission the duty to enforce the provisions of the sections referred to, and imposing upon the Attorney General the duty to prosecute actions for the enforcement of such sections.

The complaint proceeds, upon general allegation, to aver that, beginning with and since the year 1907, the increasing prices of commodities required to be purchased in the operation of the plaintiff's utility have reduced the plaintiff's net earnings, constituting the return for the use of its properties, to a grossly inadequate point; in fact, leaving it, as to some branches of its service, without return whatsoever. It specifies increases in commodities, such as coal, oil, unskilled labor, from and including the year 1916, to and including the year 1919, at the cities of La Crosse, Eau Claire, and Chippewa Falls, being three of the communities served by the utility, which increases vary, as to the different commodities, from approximately 40 to 80 per cent., and the bill submits an estimate of still further increases reasonably to be expected during the current year of 1920. It is averred that after the loss in revenues, resulting from increasing prices, plaintiff applied to the defendant·Railroad Commission "for emergency relief," but was unable to obtain and did not obtain any relief sufficient to make the plaintiff's rates compensatory; that on July 2, 1919, it filed with the commission applications for revision of its electric rates and gas rates in practically all of the communities in Wisconsin in which it supplies electricity and gas as heretofore described. In each of said applications to the commission plaintiff alleged that, by reason of the rapidly increasing costs, its rates then in effect were no longer adequate and compensatory, and asked that it be permitted to increase them "in each of said communities to such amounts as were necessary to enable it to obtain compensation for the use of its property devoted to the public service." The bill continued: "More than ten months have elapsed since said applications were filed, and except in the case of the gas rate at Chippewa Falls, heretofore referred to, the defendant Railroad Commission has not reached a determination on any of said applications, nor has plaintiff been able to obtain any relief. During the ten months that said applications have been pending and undecided, the rates which plaintiff has been permitted to collect have not been sufficient to afford plaintiff fair compensation for the value of its property devoted to the public service."

The bill then proceeds to make specific reference to the proceedings before the rate commission in respect of the revision of the electric rates in the city of Eau Claire, reciting the filing of the plaintiff's inventories of its properties, the holding of a hearing on December 4, 1919, whereat testimony of witnesses was introduced to prove the accuracy of inventories, appraisals, revenues, and operating costs under existing schedules; also adjournments of such hearing at the request of representatives of the city of Eau Claire, a subsequent hearing during which final proofs were introduced, and that "since February 25, 1920, no action has been taken, and plaintiff is apprehensive that it will be several months before the engineers of the Railroad Com-

mission will complete their work upon the appraisal, and several months after the appraisal is completed before action will be taken by the defendant Railroad Commission upon plaintiff's application." It is averred that, in other applications for revision of electric rates filed by the plaintiff with the defendant Railroad Commission, proceedings similar to those in the Eau Claire case had been had, except that by mutual consent the final closing of the proofs has been left open until the decision in the Eau Claire case shall have been made; it having been the opinion of the plaintiff that a final decision in all of such cases would be expedited by such course of procedure.

The bill discloses the proceedings had upon the plaintiff's application for a revision of its gas rates at Eau Claire and the uncompleted and undetermined state of such case before the commission. It is also averred that plaintiff's application for a revision of its gas rates in the cities of La Crosse and Chippewa Falls has been similar to those in the application for a revision of the gas rates at Eau Claire, excepting that in respect of the gas rates at Chippewa Falls the defendant commission on May 1, 1920, made an order authorizing plaintiff to increase its rates in that city approximately 25 cents per 1,000 cubic feet. Of the order evidencing such determination, the bill says: "The said order shows upon its face that the rates fixed by the Railroad Commission are sufficient only to afford plaintiff an earning of 6 per cent. upon the amount which the defendant Railroad Commission considers may have been invested in the property at the prices prevailing at the dates of construction. In making such order, operating conditions such as existed in 1919, but which, owing to the increasing cost of labor and materials, do not now exist, are used by the defendant Railroad Commission as the basis for computing the plaintiff's net revenues. The rates so fixed are not sufficient to reimburse plaintiff the cost of operating its gas property in the city of Chippewa Falls under the conditions now existing, and if plaintiff is compelled to operate its property at such rates it will receive no substantial return whatever for the use of its property."

It is further averred: "Plaintiff has been diligent in making use of every method afforded it by the statutes of Wisconsin, and the method of procedure of the defendant Railroad Commission to obtain the approval of the defendant Railroad Commission of such rates as are necessary to enable it to obtain from its revenue a fair return on the value of its property devoted to the public service, and has been unable to obtain such permission from said Railroad Commission." The bill charges that in the order last above referred to the commission, "in placing a valuation upon the physical properties of the utilities as a basis for fixing rates, has adopted its estimate of the amount invested in such physical properties, less the percentage of depreciation in such physical properties from use prior to the date of such valuation, as the value of such physical properties upon which a return may be earned, and has denied to the utilities any increase in value due to the increase in commodity costs and increase in value generally, subsequent to the time of the purchase or construction of such physical properties," and that the commission intends, in making valuations of plaintiff's physical properties for rate-fixing purposes, to be effective hereafter, to pursue a like method in making valuations of physical properties, and to deny to the plaintiff "return upon the increase in the value of its physical properties subsequent to the time of purchase or construction, regardless of any increase in the value of such physical properties that may actually exist."

The bill reiterates the low rate of return derived from its present rates for furnishing hot-water heating service at La Crosse, and "if plaintiff shall be compelled to continue operating its utilities in the Western District of Wisconsin, at the rate now in effect, its revenues under such rates will fall short of providing a fair return upon the fair valuation of its property devoted to such service by an amount in excess of $25,000 per month." The plaintiff, as a condition of obtaining the relief prayed for in its bill, offers in its bill "to enter into an understanding with the court, for the benefit of all parties interested, that it will promptly file with the defendant Railroad Commission applications asking for a revision of all its electric, gas, and heating rates, subject to the jurisdiction of the defendant Railroad Commission, to accord

with present values and operating conditions, and to proceed with reasonable diligence to bring such proceedings to a conclusion, and if the rates prescribed by the defendant Railroad Commission and such proceedings, when their validity shall have been established, are lower than the rates 'which plaintiff shall have applied and collected, plaintiff will refund to each person who shall have paid to plaintiff more than the rates so fixed by the commission, the full amount collected in excess of such rates. The rates set out in the schedules marked Exhibits B, C, and D, hereto attached and made a part hereof, are not higher than is necessary to provide a fair return upon the fair value of the property of the plaintiff devoted to the service to which such schedules of rates apply."

The bill contains the formal allegation that the compulsion of the plaintiff to operate its utilities under existing rates, unless and until the same are varied by the Railroad Commission, will, as such rates are not remunerative, deprive the plaintiff of its property without due process of law, and the enforcement of the penalties prescribed by the statutes of Wisconsin will, as the existing rates are confiscatory, deny to plaintiff the equal protection of the laws, all in violation of the Fourteenth Amendment of the Constitution of the United States.

The bill prays for a judgment declaring the rates referred to as unlawful and confiscatory, as not affording to the plaintiff an adequate return upon its property, that the statutes making effective the rates and conferring upon the commission the power to enforce them be decreed to be null and void, and that pending the determination of the case, the defendants be enjoined from taking any action of any nature whatsoever to enforce the rates or the statutes relating thereto, or any rates lower than those tendered by the plaintiff in the Schedules B, C, and D. Annexed to the bill is an exhaustive exhibit, being the report of the determination made by the Railroad Commission in respect of the gas rates in the city of Chippewa Falls, to which reference was made in the bill.

Upon the motion for a preliminary injunction the defendants submitted to the court an answer which, under the equity rule, saved the question respecting the sufficiency of the bill, and also made detailed response to the latter's allegations. During argument, notwithstanding the voluminous complaint, answer, and affidavits, it was conceded that, excepting for the partial showing made in respect of the situation at La Crosse, Chippewa Falls, and Eau Claire, the record contained no facts showing in detail the matters properly to be considered in determination of values of property of income or operating expenses at any one of the other 29 communities served by the plaintiff's utilities. Thereupon leave to amend the bill was granted, and upon the second hearing the allegations of an amended bill and answer were before the court for consideration of the merits of the motion, and extended argument and written briefs were presented touching both upon the sufficiency of the bill as presenting a cause of action, and also the equities, if the bill be deemed sufficient, in their adequacy to support a motion for a preliminary injunction.

The plaintiff, by amendment, added paragraphs supplying particular allegations respecting the value of its property at La Crosse, also its gross earnings and operating expenses and taxes earned and incurred, leaving a net profit of approximately $13,000 applicable to depreciation and return on its investment of $900,000, and that during three months ending March 31, 1920, the gross earnings in that city were approximately $40,000, its operating expenses and taxes approximately $52,000, leaving a deficit of approximately $12,000. In like manner allegations were supplied respecting the value of the property, the gross earnings, and operating expenses at Eau Claire during the year 1919, and during the three months ending March 31, 1920, leaving for the one period a balance of approximately $13,000 applicable to depreciation of property and a return upon an investment alleged to be $500,000, and for the second period nothing. Like allegations with respect to the situation at Chippewa Falls, upon a valuation of not less than $160,000, aver that during the year 1919 operating expenses and taxes exceeded gross

earnings by approximately $5,000, and during the first three months of the year 1920 by approximately $2,200.

The amendments also show that on May 21, 1920, since the filing of the bill, the defendant commission made an order permitting the plaintiff to increase its rates for gas in the city of Eau Claire 20 cents per 1,000, but that the order shows upon its face that the rates so now fixed are sufficient only to afford plaintiff an earning of 7 per cent. upon $355,000 under operating expenses such as existed in 1919, but which, because of recent increases, do not now exist; that the commission valued the plaintiff's physical properties "at the amount it considered had been invested in said physical properties when said properties were purchased or erected, less depreciation at the time of appraisal; that the amount allowed plaintiff, under the order to recover depreciation of the property used in the service, was only sufficient to enable plaintiff to recover through its rates the original cost of the property worn out in the service, and is not sufficient to enable plaintiff to renew such property at the higher prices now prevailing." Certain items showing the recent increase of operating costs are set forth in support of this allegation.

The amended bill gives further details of increased operating costs claimed to cut down net earnings in the city of La Crosse, and particularly operating costs during the year 1919, as compared with the first three months of the year 1920. These allegations concur with the charge that the rates received at La Crosse are pursuant to an order of the defendant commission made January 6, 1919, based upon evidence showing operating costs for the season of 1917 and 1918, since which years operating costs have greatly increased.

By amendment plaintiff also alleges that its utilities in the communities of Wisconsin and Minnesota "are all interconnected by a system of high voltage transmission lines, and all in common receive their supply of electric energy from plaintiff's hydro-electric generating stations at Cedar Falls, Menominee, and Rice Lake, on the Cedar river, and at Wissota on the Chippewa river, and from the plaintiff's steam electric generating station at La Crosse"; that plaintiff owns approximately 336 miles of high voltage transmission lines, employed in transmission to the several communities, and also makes use of approximately 57 miles of transmission lines not owned by it, but licensed to it by other utilities. The bill gives the names of the 32 communities served, and alleges that the value of its property, "excepting the Wissota hydro-electric development, devoted to supplying electric service to all of the communities,  *  *  *  is not less than six million six hundred thousand dollars," and "the value of plaintiff's hydro-electric development at Wissota and the Chippewa river is omitted, because of the fact that only a portion of its electrical output is consumed in the loop district, and the contention, sometimes made, that the said Wissota development is not required for the service of the utilities in the loop district is most easily met by omitting such development from property used in the loop district, and included in the operating expenses of the loop district the fair cost of the current delivery to the loop district from the Wissota development." The "loop district" is the name commonly given to the communities where the plaintiff supplies electric energy.

The bill avers that the plaintiff's gross earnings from the sale of current in the loop district for the calendar year 1919 were approximately $1,000,000, in addition to which it had certain miscellaneous earnings approximating $35,000; that during the said year operating expenses and taxes "incurred in the operation of its said utilities in the loop district, exclusive of any allowances for replacements and renewals, were $840,636.02, leaving available to plaintiff for replacements and renewals of worn-out property, and for a return upon a value of the property used in the service, approximately $192,000." A proper reserve to cover the depreciation of the depreciable property used in said loop service during said period would be approximately $109,000, leaving available for return for the use of the property devoted to such service during said period approximately $82,000; and the bill avers that "included in the operating expenses of $840,636.02, as above described, there is a charge of $377,182.69, for 16,763,675 K. W. H. of electric energy delivered to the loop district from plaintiff's Wissota hydro-electric development during said period

and charged for at the rate of 2¼ cents per K. W. H. The said electric energy was delivered to the loop district from the Wissota generating station at a low factor of approximately 18 per cent., and at a maximum demand of approximately 10,000 K. W. The cost to plaintiff of delivering said electric energy from its Wissota development at such demand and upon such low factor was not less than the amount charged against the loop district for such concurrence, and that amount is not more than it would have cost the plaintiff to produce said current by any other method."

It is charged that in the schedule attached to the original bill there is disclosed an equitable distribution "among all of plaintiff's customers in said loop district; the cost of performing the service including a return in no case exceeding 8 per cent. upon the value of the plaintiff's property devoted to such service. In preparing the rates set forth in said Schedule E, recognition is given to the fact that rates in the larger cities, in which the business is well developed, should be lower than in smaller communities. The rates set forth in said Schedule E are not in all cases higher than the rates now in effect, and are higher than the rates now in effect only in those cases, where the rates now in effect are so low that the customers obtaining service under such rates do not contribute their fair share toward the cost of the service."

To the original and amended bills the defendants, at the second hearing, interposed a voluminous amended answer, wherein issue is taken upon many of the plaintiff's allegations, including, among others, the valuation of properties, the gross earnings, operating costs and charges, and also the net returns; specific issue being taken upon allegations respecting either the disparity between gross earnings and operating costs, and upon the claim of deficit in any branch of the service rendered by the utilities to the public. Such answer singles out with some particularity the plaintiff's so-called "Wissota" dam, averring it to have been exceedingly expensive and projected upon a scale "not needed for the service which the plaintiff was then rendering to the public in Wisconsin, and now greatly exceeds the needs of said services, and that plaintiff has a poorly developed market in Wisconsin for the product of 'said power plant; that during the Wissota development * * * the plaintiff owned and was operating a hydro-electric plant at Chippewa Falls having an annual capacity of approximately 2,000,000 K. W. H., another hydro-electric plant at Eau Claire, having an annual capacity of 4,000,000 K. W. H., and that the hydro-electric plants just mentioned are both carried on the books of the company at a very large amount; that the plaintiff has entirely discontinued the use of, and at present does not use, the hydro-electric plant at Chippewa Falls, and has leased outright to the E. C. Dalles Improvement Company for an annual rental of $30,000, which rental makes no provision for depreciation or taxes, its plant at Eau Claire; that the capacity of the electric generating properties owned by the plaintiff, at the time it entered upon a construction of the Wissota plant, and throughout the progress of such construction, exceeded the plaintiff's market and demand for electricity."

The answer continues: "That the chief object of the construction of the Wissota dam and electric development was to furnish electricity to consumers or purchasers outside the state of Wisconsin, and chiefly to the Northern States Power Company, a Minnesota corporation; that the plaintiff claims that the development of this water power and the construction of the transmission lines therefrom to the state line represent an investment and property of the value of more than $7,000,000; that the plaintiff seeks to require the Wisconsin consumers of its product to bear a large and undue portion of the burden of said Wissota development; that less than 12 per cent. of said property and investment is used or usable in the service rendered to Wisconsin consumers; that the plaintiff is now under contract with the Northern States Power Company for delivery to it at the state line, for consumption in the Twin Cities, of a vast amount of electric current for a term of years, and that the plaintiff is thereby required to and does deliver an exceedingly large amount of constant electric current, sometimes called 'firm power, generated at Wissota at a very low rate, and to deliver its surplus current

or dump power at still lower rates; that the rates stipulated in said contract are very much lower absolutely and relatively than the rates now in force in Wisconsin and charged to plaintiff's Wisconsin consumers; that by said contract the plaintiff agrees to deliver to the Northern States Company constant electric energy to the amount of 52,000,000 K. W. H. at 5½ mills per K. W. H. for the year 1920, and for each year thereafter during the life of the contract; that by said contract the purchaser agrees to take and pay for surplus and additional energy at the rate of 3 mills per K. W. H. for 52,000,000 K. W. H. during the year 1920, and for each year thereafter during the life of the contract; that by said contract the plaintiff agrees to supply said purchaser at 2 mills per K. W. H. with all surplus energy furnished to the purchaser in the year 1920, and each year during the life of the contract, in excess of 104,000,000 K. W. H. per year, and the plaintiff thereby further agrees to supply the purchaser with all surplus energy each year up to the full capacity and stream flow available at the Wissota hydraulic electric generating plant, in excess of the plaintiff's other requirements."

The bill alleges that, of the power generating at Wissota in 1919, nine-tenths went to said Northern States Power Company, and about one-tenth was consumed in the loop district. The facts are alleged in some detail.

The defendants, referring to the proceedings initiated by the plaintiff before the commission, in July, 1919, aver diligent consideration thereof, in view of the scope of the inquiry and the necessity of committing its expert accountants and engineers to the task, the early probable completion of their work and submission of the same to the plaintiff for examination—the defendant averring that plaintiff had requested that no order be made by the commission fixing the rates for electric energy until opportunity for such examination be afforded to the plaintiff. The answer likewise refers to the determinations made by the defendant commission with respect to rates in the three communities referred to in the bill, but sharply controverts its allegations respecting valuations, operating expenses, and the distribution thereof as contended by the plaintiff, and generally denies the confiscatory or unlawful character of any of the rates fixed by it. It avers the binding force and effect of certain of the rates fixed unless and until application for revision be made to the commission upon facts not heretofore presented to it—that is, that any revision based upon conditions developing since the award must first be requested of the defendant commission before proceeding in a court of equity to impugn the existing rate by reason of such conditions. It likewise sets forth various applications for emergency relief made and granted, and, in respect of the allegations of the amended complaint, specifically denies the valuations claimed by the plaintiff in respect of its property at Eau Claire, La Crosse, and Chippewa Falls; and with respect to these communities, as well as the value of plaintiff's entire property, the defendants by specific allegation aver the respective properties to be fairly and reasonably worth a much smaller sum than set up in the bill.

Specific issue is taken on the allegations respecting the amount of electric energy delivered, during the year 1919, to the public of Wisconsin, and a like issue respecting the fair rate to be charged for such as was delivered. In this aspect of the case the defendant sets up in considerable detail evidentiary matters bearing upon the question of value, costs, and reasonableness of rate, as well as distribution of values and operating expenses, in view of certain contracts for delivery of electric energy which the plaintiff holds. The prayer of the answer is for a dismissal of the bill.

Lees & Bunge, of La Crosse, Wis., and Norris, McPherson, Harrington & Waer, of Grand Rapids, Mich., for plaintiff.

M. B. Olbrich, Deputy Atty. Gen., and E. E. Brossard, Asst. Atty. Gen., of Wisconsin, for defendants.

Before ALSCHULER and EVAN A. EVANS, Circuit Judges, and GEIGER, District Judge.

GEIGER, District Judge (after stating the facts as above).  [1]
There are presented sharply contested questions, which the parties
variously state as bearing upon the jurisdiction of the court, or upon
the sufficiency of the bill in its disclosure of a cause of action, or upon
the propriety of granting an injunction pendente lite, in view of cer-
tain issues of fact to be alluded to.

. Speaking generally, the parties will agree that a cause of action
to restrain an aggression by the state, through its tribunals or officials,
upon the property or property rights of the plaintiff, in violation of the
protection afforded by the Fourteenth Amendment, is within the gen-
eral equitable cognizance of the court; and of course no other stat-
utory requisite need be present than an appropriate disclosure of a case
so arising in the plaintiff's behalf under the Constitution or laws of
the United States.  The voluminous pleadings and record have neces-
sitated such references thereto and excerpts therefrom as enable an
understanding of the propositions deemed vital in the disposition of
the pending motion.  We feel that two questions must be answered,
each of which is more or less dependent, in the facts out of which
it arises and the answer to be given to it, upon the other.  They are:
First. What are the dominant facts, disclosed in the bill, respecting
the plaintiff, its situation in its property and property rights, partic-
ularly in their relation to the state of Wisconsin, the defendant com-
mission, and to proceedings pending before the latter?  Secondly. Can
the court award a writ of injunction pendente lite, in view of the
answer to be given to the foregoing question, and, if so, should it exer-
cise the power, in view of issues of fact tendered in this case?

In their consideration, the inquiry must proceed upon recognition
of the plaintiff company as a creature of the state of Wisconsin, and,
as such, subject generally to its laws and public policy respecting the
conduct of its business as a public utility; that presumptively the acts
of the state and its tribunal, the defendant commission, are valid, and
not repugnant to any right or immunity guaranteed to the plaintiff by
the Constitution of the United States; that likewise the defendant
commission presumptively has full jurisdiction to function obediently
to the state law, and hence the proceedings now pending before it at
the plaintiff's instance must be deemed to have been initiated, and to
be pending, rightfully, to the end that the vested power of such com-
mission may be exercised, not merely to bring about a result satis-
factory to the plaintiff's wishes or desires, but to determine the quan-
tum of relief to which it is entitled, consistently with its obligations
to, and the rights of, the public, which are equally within the cognizance
of the commission for protection.  In other words, that the juris-
diction of the commission, to the extent that it has been invoked, be
discharged.

We start, then, with the outstanding facts that in July, 1919, the
plaintiff filed with the defendant commission its petition, asking for
an increase of rates, in its entire service to 32 communities within the
state of Wisconsin; that such proceeding is still pending and unde-
termined, except as to three communities heretofore referred to; that
as to such communities the commission has acted, awarding an increase

of rates, which, however, as appears from the bill, is not satisfactory to the plaintiff, but is charged to be nonremunerative and confiscatory, in view of its claims respecting the value and cost of operating its property in those communities. The petition—at least so it was conceded upon the argument before us—is as broad in its scope as is the activity of the plaintiff in its business as a public utility within the state of Wisconsin, and certainly aims at an objective in respect of reviewing its rates just as broad as the present bill.

Obviously, in so far as the commission has passed upon the rates in the three communities referred to, the present bill challenges its determination; but with respect to all of the other communities it can do no more than to ask the judgment of this court respecting the reasonableness of rates, upon the apprehension that the commission, if it continue in its consideration of the petition pending before it, is certain to fail in giving the measure of relief to which plaintiff insists it is entitled. In other words, there has been no determination by the commission upon the petition pending before it, except as to three communities, although concededly the plaintiff's property situation—its plant, as it may be called—is in many respects unitary, necessitating, in considering the needs and obligations of any one community, a consideration of values and operating costs at central or outside sources of power, and the like.

Now the defendants rest upon these outstanding facts as a sufficient basis for challenging the plaintiff's attempt to resort to equity, in advance of a determination of the very matters comprehended within the bill by the tribunal which the state has constituted for that purpose, and whose jurisdiction the plaintiff has in fact invoked and concedes. We believe the challenge to be well founded, not only in reason and good sense, but rather clearly upon precedent, disclosed in cases like Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, and Bacon v. Rutland Railroad Co., 232 U. S. 134, 34 Sup. Ct. 283, 58 L. Ed. 538, and, as it is not claimed in the case before us that the delay in determining fully the pending petition before the commission is unreasonable, or that the conduct of the commission has been arbitrary or capricious, the authority of such cases is controlling, with respect to equitable interference pending legislative or administrative procedure by a duly constituted tribunal. In the Prentis Case, this view of the bills there tendered was expressed:

"It appears on their face that the appellees did not avail themselves of the right of appeal to the Court of Appeals of Virginia, which absolutely vested in them by the Constitution and laws of that commonwealth. Such an appeal would have brought up the question of the alleged unreasonableness of the designated rate, and appellees cannot assume that the decision of the commission would necessarily have been affirmed. If reversed or changed to meet appellees' views, the whole ground of equity interposition would disappear. In such circumstances it is the settled rule that courts of equity will not interfere. The transaction must be complete, and jurisdiction cannot be rested on hypothesis. A fortiori, this must be so where federal courts are asked to interfere with the legislative, executive or judicial acts of a state, unless some exceptional and imperative necessity is shown to exist, which cannot be asserted here."

And in the Rutland Case, the court, although distinguishing the Prentis Case, still points out that before a party may resort to equity the matter or case must have reached "the judicial stage." See 232 U. S. 147, 34 Sup. Ct. 283, 58 L. Ed. 538.

If, therefore, we assume that the plaintiff in this case invoked the jurisdiction of the State Railroad Commission for the broad purpose of considering and revising its rates as disclosed by itself in the petition filed in July, 1919, it would be anomalous to recognize the constant alternative of resorting to equity merely if, because of delay, disappointment in partial determination, or for other considerations, the further prosecution, or the awaiting of the final result of, the commission proceedings, was no longer desirable. And it is equally true that if, as suggested by plaintiff's counsel upon the hearing of the present motion, a plaintiff may always resort to the federal equity courts for the mere purpose of challenging as confiscatory, a rate or rule established by a state commission, it must follow that preliminary injunctions, when having no other support than the claim made by a plaintiff in a case like this, will prove a means of perpetually tying up the functioning of the state laws.

The whole question arises, as we view it, not as one of comity, but rather one of fact, in establishing the proposition that the state, through its tribunals, has committed, or is threatening to commit, aggression upon the complainant's property or property rights. Taking the broad case made by the plaintiff's bill, it is not that the rates originally fixed are now confiscatory, and that the state, through the defendant commission, adheres to them and refuses to give consideration to the facts recited in the bill; for the plaintiff has availed itself of the jurisdiction furnished by the state to conduct an inquiry into its rates and to award an increase. The plaintiff, except as to the three communities, does not pretend that the commission has denied or will deny all relief which it asks for in its petition. The most that it can claim, upon the broad aspect of its petition and the present bill, is that, if it ultimately prevails, or if it fails upon the issues presented to the commission, and the latter's determination is ultimately condemned by the court, it will in either event sustain an interim loss. This seems to us to be purely a hypothetical, if not conjectural, basis for invoking the equity jurisdiction. Prentis v. Coast Line, supra.

[2] It clearly eliminates the necessity, ordinarily present in equity upon applications for a preliminary injunction, of a clear showing respecting not only the plaintiff's right, but of the defendants' wrong or aggression. It is one thing to make a clear prima facie showing, and quite another to merely set up the claim and ask that the injunction issue for interim protection because the plaintiff may prevail.

The matter can be presented in another way, through the simple query: Is the plaintiff in the present case disclosing, or attempting to disclose, a denial of, or an aggression upon, its property or property rights by the state, upon the same facts disclosed before the commission or inhering necessarily in the rate complained of; and has the state finally denied the plaintiff's right upon the facts so disclosed? This query, so it seems to us, is expressly answered in the negative

by the plaintiff's bill, which, while complaining of the rates existent when its petition was filed in July, 1919, seeks not merely to present to this court the facts which *then* may have been pertinent, but other facts transpiring since the commencement of the proceedings before the commission upon which it lays, or seeks to lay, great emphasis.

Now, omitting for the present reference to the facts transpiring during the current year, how idle would be attempts to regulate and enforce rates through a state tribunal, if concurrently with the prosecution of a remedy provided by the state law before the state tribunal the entire functions of the state law could be superseded by a federal (or state) court of equity, merely upon the hypothesis that the complaining party may ultimately prevail. In that event, the injunction pendente lite would, of course, be based upon no matter of *fact* in issue between the parties, and yet it would effectually operate to condemn the regulation of the state tribunal and forbid the latter from functioning, pending the trial, except to such an end as may meet the concurrence of the equity court.

As already noted, the situation, as disclosed in the present bill, is far from that of merely complaining of the rates in effect in July, 1919, and averring that such rates were the last expression of the legislative or executive will of the state, from which plaintiff, notwithstanding due representation of all of the facts averred in the present bill, could not be released or relieved, to the end of getting an adequate return. In other words, the plaintiff, upon the record before us, cannot be heard to say that, upon the facts now presented as relevant to the question of a lawful and nonconfiscatory rate, the state has denied, and is denying, relief, leaving the plaintiff no alternative but to resort to equity to restrain an impending unconstitutional aggression.

These considerations are emphasized when once we reflect what must ensue upon an injunction pendente lite in the situation disclosed. The plaintiff must, of course, concede that, whether or not an injunction is issued, the commission will retain its power to inquire into and regulate the plaintiff's rates. If the rates now under consideration by the commission are held preliminarily by this court to be confiscatory, will the parties proceed before the commission, or before this court, in further inquiry, to the end of fixing a constitutional rate? If before the former, will the future functioning of the commission be freed from the surveillance of the preliminary injunction, and from the effectiveness of a preliminary adjudication of the court respecting values and the like?

Certainly the courts could not by preliminary injunction restrain enforcement of any rate, without fixing for the time being some of the elements upon which lawful or nonconfiscatory rates are based; that is to say, if an existent rate is to be condemned, it can only be upon recognition of some standard of value, of property, likewise of operating expenses. So that, if in the case before us the court should condemn the existing rates, with or without recognition of the tentative rates tendered by the complainant, it would seem idle to have the commission function further in the pending proceedings before it, because ultimately it would lead merely to the necessity of a recession by

the court or the commission of either of their respective determinations, whether they be final or preliminary.

If, therefore, it be assumed that the equitable jurisdiction could ultimately prevail, there is none the less established a policy whereunder the system of regulating public utilities may be made nominal only; the real regulation being conducted in equity. We believe that the plaintiff's bill discloses this very infirmity, and, if the jurisdiction were exercised, this result would follow in the particular case before us, and that regulation by the defendant tribunal would amount to nothing, because the proceedings pending before it could at all times be frustrated in the accomplishment of their object through the concurrent exercise of the equitable power, which latter, of course, if not resorted to for the purpose of *dominating* it, ought not to be resorted to at all until *finality* of action by the state can be asserted.

This conclusion is reached upon consideration of the bill in its broader aspect and purposes, and is not limited to a consideration of the case which might be made upon the narrow facts pertaining to any one or all of the three communities concerning whose rates the commission has made an award. We are taking the situation in its entirety, as the plaintiff professed to present it, both in its application before the defendant commission and in its bill, which invokes the interference of the court as against the whole subject of rates rendered for service in the various communities referred to.

[3] Upon the view that the bill is fatally defective in the respects noted, wherefore the court, although answer has been interposed, will decline to issue an injunction, a consideration of the subsidiary feature of the second question heretofore suggested, and any other question argued, is unnecessary. But, dealing with the bill as a whole, or segregating the allegations pertaining to the plaintiff's properties, service and rates at La Crosse, Eau Claire, and Chippewa Falls, the defendants have, upon either aspect, met the allegations so fully by direct denial of the material matters of fact, by counter allegations setting up affirmatively either countervailing facts or disputation of the claims on the part of the plaintiff that the defendant commission was proceeding erroneously, by refusing to apply proper standards of value, or of operating expenses, or of distribution of values, or operating expenses between different communities, as render it impossible preliminarily to accept plaintiff's claim upon any of these matters, in satisfaction of the rule requiring a prima facie clear showing as a basis for an injunction pendente lite. The pleadings as they now stand, and the discussion by counsel upon argument, preclude the thought that any fact or facts could be seized upon by the court as sufficiently free from doubt and as sufficient basis in equity to justify the requisite preliminary conclusion. Therefore, even if the matters first herein considered could be eliminated, the court could not with propriety award preliminary relief.

The conclusion is that the application for an injunction pendente lite will be denied, and an order may be entered accordingly.